647 F.2d 42
 COLVILLE CONFEDERATED TRIBES, Plaintiff-Appellant,
v.
Boyd WALTON, Jr., et ux, et al., Defendants-Appellees,
and
State of Washington, Intervening Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Boyd WALTON et ux, Defendants-Appellants,
and
State of Washington, Defendant.
UNITED STATES Of America, Plaintiff-Appellee,
v.
William Boyd WALTON, Jr., et ux, Defendants,
and
State of Washington, Defendant-Appellant.
 Nos. 79-4297, 79-4309 and 79-4383.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 6, 1980.
Decided June 1, 1981.
 
 Richard B. Price, Nansen, Price & Howe, Omak, Wash., for Walton.
 Charles B. Roe, Jr., Olympia, Wash., for State of Wash.
 Sanford Sagalkin, Washington, D.C., argued; Robert M. Sweeney, Asst. U.S. Atty., Spokane, Wash., for U.S.A.
 William H. Veeder, Washington, D.C., for Colville et al.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before WRIGHT and SKOPIL, Circuit Judges, and CURTIS,* Senior District Judge.
 WRIGHT, Circuit Judge:
 
 
 1
 Rehearing has been granted. The opinion filed on August 20, 1980 is withdrawn and is replaced by this opinion.
 
 
 2
 The Colville Confederated Tribes initiated this case a decade ago. They sought to enjoin Walton, non-Indian owner of allotted lands, from using surface and ground waters in the No Name Creek basin. The State of Washington intervened, asserting its authority to grant water permits on reservation lands, and the case was consolidated with a separate suit brought by the United States against Walton.
 
 I. BACKGROUND
 A.
 
 3
 In 1871 the predecessors of the Colville Confederated Tribes had no treaty with the United States and no reservation.[1] These Indians were contemporaneously described as "good farmers, (who) raise extensive crops, make good improvements, and own stocks of cattle and horses." (1871) Report of the Commissioner of Indian Affairs, 277.
 
 
 4
 After the Civil War, settlers had begun to encroach on Indian lands. The Farmer in charge at Fort Colville reported that violence was likely unless a reservation was established to protect Indian interests. Id. In response to a request from the Commissioner of Indian Affairs, President Grant created the Colville Reservation. Executive Order of July 2, 1872, reprinted in 1 Kapler, Indian Affairs, Laws and Treaties, 915-16. (2d ed. 1904).[2] Twenty years later, the northern half of the reservation was taken from the Indians and opened for entry and settlement.[3]
 
 
 5
 In 1906, Congress ratified an agreement with the Colvilles that provided for distribution of reservation lands to the Indians pursuant to the General Allotment Act of 1887, 24 Stat. 388, and for disposition of the remainder by entry and settlement. Act of Mar. 22, 1906, Pub.L. No. 59-61, ch. 1126, 34 Stat. 80. The agreement was effectuated by Presidential proclamation in 1916.[4] 39 Stat. 1778.
 
 
 6
 In 1917, a row of seven allotments was created in the No Name Creek watershed. Walton, a non-Indian, now owns the middle three, numbers 525, 2371 and 894. He bought them in 1948 from an Indian, not a member of the Tribe, who had begun to irrigate the land by diverting water for 32 acres from No Name Creek. Walton immediately procured a permit from the state to irrigate 65 acres by diverting up to 1 cubic foot per second "subject to existing rights." He now irrigates 104 acres and uses additional water for domestic and stock water purposes.
 
 
 7
 The United States holds the remaining allotments in trust for the Colville Indians. Allotments 526 and 892 are north of Walton's property and allotments 901 and 903 are south. Allotments 892, 901 and 903 are held for heirs of the original allottees, but the Tribe has a long-term lease. Allotment 526 is beneficially owned by the Tribe.[5]
 
 B.
 
 8
 The No Name Creek is a spring-fed creek flowing south into Omak Lake, which has no outlet and is saline. The No Name hydrological system, consisting of an underground aquifer and the creek, is located entirely on the Colville Reservation.
 
 
 9
 The aquifer lies under the Indians' northern allotments and the northern tip of Walton's allotment, number 525. No Name Creek originates on the southern tip of the Indians' allotment number 802 and flows through Walton's allotments and the Indians' southern allotments.
 
 C.
 
 10
 Salmon and trout were traditional foods for the Colville Indians, but the salmon runs have been destroyed by dams on the Columbia River. In 1968, the Tribe, with the help of the Department of the Interior, introduced Lahonton cutthroat trout into Omak Lake. The species thrives in the lake's saline water, but needs fresh water to spawn. The Indians cultivated No Name Creek's lower reach to establish spawning grounds but irrigation use depleted the water flow during spawning season. The federal government has given the Indians fingerlings to maintain the stock of trout.
 
 II. THE CASE BELOW
 
 11
 The trial court found that 1,000 acre feet per year of water were available in No Name Creek Basin in an average year. It calculated the quantity of the Colvilles' reserved water rights on the basis of irrigable acreage. The court excluded the northern-most allotment, number 526, because the evidence showed that it was formerly irrigated with the surface waters of Omak Creek, and the Tribe had not demonstrated that water to irrigate it was required from the No Name system.
 
 
 12
 The trial court determined the Indians had a reserved right to 666.4 acre feet per year of water from the No Name Creek Basin. It held that Walton was not entitled to share in the Colvilles' reserved water rights. The trial court found, however, that the Colvilles were irrigating only a portion of the irrigable acres included in its calculation.
 
 
 13
 Under the district court's findings, in an average year there are 333.6 acre feet per year of water not subject to the Indians' reserved right. There are an additional 237.6 acre feet per year of water to which the Indians have a reserved right, but which they are not currently using. This water is available for appropriation by non-Indians, subject to the Indians' superior right. The court held that Walton had a right to irrigate the 32 acres under irrigation at the time he acquired his land, with a priority date of the actual appropriation of water for that use.
 
 
 14
 The court also held that the Indians were potentially entitled to use water to propagate trout, but refused to award water for that purpose. It concluded that spawning was unnecessary because fingerlings were provided free by the federal government.
 
 
 15
 By post-trial motion, the Indians sought permission to use some of their irrigation water for trout spawning. The motion was granted and the Tribe has since pumped aquifer water from their wells into No Name Creek during spawning season.
 
 
 16
 Finally, the court decided that the state could regulate No Name water not reserved for Indian use.
 
 
 17
 Walton, the Tribe and the State appeal parts of the decision. Colville Confederated Tribes v. Walton, 460 F.Supp. 1320 (E.D.Wash.1978).[6]
 
 III. THE TRIBE'S WATER RIGHTS
 
 18
 The Colvilles argue they have a right to use the waters of the No Name system under the implied-reservation, or Winters doctrine. We first consider the existence and the extent of that right.
 
 A.
 
 19
 Congress has the power to reserve unappropriated water for use on appurtenant lands withdrawn from the public domain for specific federal purposes. United States v. New Mexico, 438 U.S. 696, 698, 98 S.Ct. 3012, 3013, 57 L.Ed.2d 1052 (1978). Where water is needed to accomplish those purposes, a reservation of appurtenant water is implied. Id. at 700, 98 S.Ct. at 3014; Cappaert v. United States, 426 U.S. 128, 139, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976). The United States acquires a water right vesting on the date the reservation was created, and superior to the rights of subsequent appropriators. Cappaert, 436 U.S. at 138, 96 S.Ct. at 2069.
 
 
 20
 An implied reservation of water for an Indian reservation will be found where it is necessary to fulfill the purposes of the reservation. In United States v. Winters, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908), the Court found an implied reservation because the land of the Fort Belknap reservation would have been valueless without water. Similarly, an implied reservation was found where water was "essential to the life of the Indian people." Arizona v. California, 373 U.S. 546, 599, 83 S.Ct. 1468, 1497, 10 L.Ed.2d 542 (1963).
 
 
 21
 In those cases, if water had not been reserved, it would have been subject to appropriation by non-Indians under state law. Because the Indians were not in a position, either economically or in terms of their development of farming skills, to compete with non-Indians for water rights, it was reasonable to conclude that Congress intended to reserve water for them.[7]
 
 
 22
 The Colvilles were in a similar position when their reservation was created. As in Winters, the Indians relinquished extensive land and water holdings when the reservation was created. Some gave up valuable tracts with extensive improvements. Note 2, supra.
 
 
 23
 Congress intended to deal fairly with the Indians by reserving waters without which their lands would be useless. Arizona v. California, 373 U.S. at 600, 83 S.Ct. at 1497. We hold that water was reserved when the Colville Reservation was created.
 
 B.
 
 24
 The more difficult question concerns the amount of water reserved. In determining the extent of an implied reservation of water for a national forest, the Supreme Court held:
 
 
 25
 Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.
 
 
 26
 United States v. New Mexico, 438 U.S. at 702, 98 S.Ct. at 3015.
 
 
 27
 We apply the New Mexico test here. The specific purposes of an Indian reservation, however, were often unarticulated.[8] The general purpose, to provide a home for the Indians, is a broad one and must be liberally construed.[9] We are mindful that the reservation was created for the Indians, not for the benefit of the government.
 
 
 28
 To identify the purposes for which the Colville Reservation was created, we consider the document and circumstances surrounding its creation, and the history of the Indians for whom it was created. We also consider their need to maintain themselves under changed circumstances.[10] See United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905).
 
 
 29
 These factors demonstrate that one purpose for creating this reservation was to provide a homeland for the Indians to maintain their agrarian society. In a similar setting, the Supreme Court agreed with a Master's finding that water was reserved to meet future as well as present needs, and concluded "that the only feasible and fair way by which reserved water for the reservation can be measured is irrigable acreage." Arizona v. California, 373 U.S. at 600-01, 83 S.Ct. at 1497-98. We conclude that, when the Colville reservation was created, sufficient appurtenant water was reserved to permit irrigation of all practicably irrigable acreage on the reservation.
 
 
 30
 Providing for a land-based agrarian society, however, was not the only purpose for creating the reservation. The Colvilles traditionally fished for both salmon and trout. Like other Pacific Northwest Indians, fishing was of economic and religious importance to them. See Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 665, 99 S.Ct. 3055, 3064, 61 L.Ed.2d 823 (1978); United States v. Winans, supra; (1871) Report of the Commissioner of Indian Affairs 277.
 
 
 31
 The Tribe's principal historic fishing grounds on the Columbia River have been destroyed by dams. The Indians have established replacement fishing grounds in Omak Lake by planting a non-indigenous trout.
 
 
 32
 We agree with the district court that preservation of the tribe's access to fishing grounds was one purpose for the creation of the Colville Reservation. Under the circumstances, we find an implied reservation of water from No Name Creek for the development and maintenance of replacement fishing grounds.
 
 
 33
 We note that the nature of a right to water for a replacement fishery is such that it cannot coexist with continuing rights to water for a fishery in the watershed where the fishery historically existed. Walton does not argue that the tribe has such rights. We affirm the district court's holding that the Colvilles have a reserved right to the quantity of water necessary to maintain the Omak Lake Fishery.
 
 C.
 
 34
 The district court held that water for spawning could not be awarded at this time because the federal government provides the necessary fingerlings. We reverse this holding.
 
 
 35
 The right to water to establish and maintain the Omak Lake Fishery includes the right to sufficient water to permit natural spawning of the trout. When the Tribe has a vested property right in reserved water, it may use it in any lawful manner. As a result, subsequent acts making the historically intended use of the water unnecessary do not divest the Tribe of the right to the water.
 
 
 36
 We recognize that open-ended water rights are a growing source of conflict and uncertainty in the West. Until their extent is determined, state-created water rights cannot be relied on by property owners. See Laird, The Winters Cloud Over the Rockies: Water Rights and the Development of Western Energy Resources, 7 Am. Indian L.Rev. 15 (1979); Public Land Law Review Commission, One Third of the Nations Lands, 144 (1970).
 
 
 37
 Resolution of the problem is found in quantifying reserved water rights, not in limiting their use. The Special Master in Arizona v. California determined that the purposes for which the reservation was created governed the quantification of reserved water, but not the use of such water:
 
 
 38
 This (method of quantifying water rights) does not necessarily mean, however, that water reserved for Indian Reservations may not be used for purposes other than agricultural and related uses The measurement used in defining the magnitude of the water rights is the amount of water necessary for agriculture and related purposes because this was the initial purpose of the reservation, but the decree establishes a property right which the United States may utilize or dispose of for the benefit of the Indians as the relevant law may allow.
 
 
 39
 Report from Simon H. Rifkind, Special master, to the Supreme Court 265-66 (December 5, 1960) (emphasis added).
 
 
 40
 The Department of the Interior has taken the position that a change of use is permissible. See Memorandum from Solicitor of the Department of the Interior to the Secretary of the Interior, February 1, 1964 (use of reserved water for recreation and housing development).
 
 
 41
 Finally, we note that permitting the Indians to determine how to use reserved water is consistent with the general purpose for the creation of an Indian reservation providing a homeland for the survival and growth of the Indians and their way of life.
 
 D.
 
 42
 We agree with the district court that water for Allotment 526 need not be included in its calculations, since such water is potentially available from Omak Creek.[11] The Indians have not demonstrated that water is unavailable from Omak Creek, or that its use involves significant disadvantages.[12]
 
 IV. THE GENERAL ALLOTMENT ACT OF 1887
 
 43
 We next consider Walton's rights as the fee owner of allotted land, and reverse the district court's judgment that he has no right to reserved water.
 
 A.
 
 44
 The General Allotment Act provided that land on reservations could be allotted for the exclusive use of individual Indians. Remaining land was to be made available for homesteading by non-Indians. After holding allotted lands in trust for individual Indians for a 25-year period, the federal government could convey the land to the allottee in fee, "discharged of said trust and free of all charge or incumbrance whatsoever." 25 U.S.C. § 348.
 
 
 45
 Because the use of reserved water is not limited to fulfilling the original purposes of the reservation, Congress had the power to allot reserved water rights to individual Indians, and to allow for the transfer of such rights to non-Indians. Whether it did so is a question of congressional intent.
 
 
 46
 The General Allotment Act represented the shift in federal objectives from segregation of Indians on reservations to assimilation of them in non-Indian culture and society. Its primary sponsor, Senator Dawes, explained that "the quicker (the Indian) is mingled with the whites in every particular the better it will be." Report of the Secretary of the Interior, Proceedings of Mohonk Lake Conference, H.R. Exec. Doc. No. 75, 49th Cong., 2d Sess. 992 (1887).
 
 
 47
 The Act was designed to encourage Indians to become self-supporting citizens by making them landowners. See generally D. Otis, The Dawes Act and the Allotment of Indian Lands 8-32 (1973). Allotted lands were held in trust for a 25-year period because of
 
 
 48
 the desire to protect the Indian against sharp practices leading to Indian landlessness, the desire to safeguard the certainty of titles, and the urge to continue an important basis of governmental activity (on the Indians' behalf).
 
 
 49
 F. Cohen, Handbook of Federal Indian Law 221 (1940); U.S. Department of Interior, Federal Indian Law 788-89 (1958).
 
 
 50
 The only reference to water rights in the Act is found in section 7:
 
 
 51
 In cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior is authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservation; and no other appropriation or grant of water by an riparian proprietor shall be authorized or permitted to the damage of any other riparian proprietor.
 
 
 52
 25 U.S.C. § 381.
 
 
 53
 The Act was passed over 20 years before the Supreme Court announced the implied-reservation doctrine in Winters. There is nothing to suggest Congress gave any consideration to the transferability of reserved water rights. To resolve this issue, we must determine what Congress would have intended had it considered it.B.
 
 
 54
 It is settled that Indian allottees have a right to use reserved water. United States v. Powers, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939).[13] "(W)hen allotments were made for exclusive use and thereafter conveyed in fee, the right to use some portion of tribal waters essential for cultivation passed to the owners." Id. at 532, 59 S.Ct. at 346. We must determine whether non-Indian purchasers of allotted lands also obtain a right to some portion of reserved waters.
 
 
 55
 (1)
 
 
 56
 The general rule is that termination or diminution of Indian rights requires express legislation or a clear inference of Congressional intent gleaned from the surrounding circumstances and legislative history. See Bryan v. Itasca County, 426 U.S. 373, 392-93, 96 S.Ct. 2102, 2112-13, 48 L.Ed.2d 710 (1975); Mattz v. Arnett, 412 U.S. 481, 504-05, 93 S.Ct. 2245, 2257-58, 37 L.Ed.2d 92 (1972). Upon careful consideration, we conclude this principle supports the proposition that an Indian allottee may sell his right to reserved water.
 
 
 57
 The district court's holding that an Indian allottee may convey only a right to the water he or she has actually appropriated with a priority date of actual appropriation reduces the value of the allottee's right to reserved water. We think this type of restriction on transferability is a "diminution of Indian rights" that must be supported by a clear inference of Congressional intent.
 
 
 58
 By placing allotted lands in trust for 25 years, Congress evinced an intent to protect Indians by preventing transfer of those lands.[14] But there is no basis for an inference that some restrictions survived beyond the trust period. Congress provided for extensions of the trust period, but directed that fee title be conveyed to the allottee when the period expired. We think the fee included the appurtenant right to share in reserved waters, and see no basis for limiting the transferability of that right.
 
 
 59
 This conclusion is supported by our decision in United States v. Ahtanum Irrigation District, 236 F.2d 321, 342 (9th Cir. 1956), cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). Ahtanum held that non-Indian purchasers of allotted lands are entitled to "participate ratably" with Indian allottees in the use of reserved water. See United States v. Adair, 478 F.Supp. 336 (D.Ore.1979); United States v. Hibner, 27 F.2d 909 (D.Idaho 1928).
 
 
 60
 (2)
 
 
 61
 In determining the nature of the right acquired by non-Indian purchasers, we consider three aspects of an allottee's right to use reserved waters.
 
 
 62
 First, the extent of an Indian allottee's right is based on the number of irrigable acres he owns. If the allottee owns 10% of the irrigable acreage in the watershed, he is entitled to 10% of the water reserved for irrigation (i. e., a "ratable share"). This follows from the provision for an equal and just distribution of water needed for irrigation.
 
 
 63
 A non-Indian purchaser cannot acquire more extensive rights to reserved water than were held by the Indian seller. Thus, the purchaser's right is similarly limited by the number of irrigable acres he owns.
 
 
 64
 Second, the Indian allottee's right has a priority as of the date the reservation was created. This is the principal aspect of the right that renders it more valuable than the rights of competing water users, and therefore applies to the right acquired by a non-Indian purchaser. In the event there is insufficient water to satisfy all valid claims to reserved water, the amount available to each claimant should be reduced proportionately.
 
 
 65
 Third, the Indian allottee does not lose by non-use the right to a share of reserved water. This characteristic is not applicable to the right acquired by a non-Indian purchaser. The non-Indian successor acquires a right to water being appropriated by the Indian allottee at the time title passes. The non-Indian also acquires a right, with a date-of-reservation priority date, to water that he or she appropriates with reasonable diligence after the passage of title. If the full measure of the Indian's reserved water right is not acquired by this means and maintained by continued use, it is lost to the non-Indian successor.
 
 
 66
 The full quantity of water available to the Indian allottee thus may be conveyed to the non-Indian purchaser. There is no diminution in the right the Indian may convey. We think Congress would have intended, however, that the non-Indian purchaser, under no competitive disability vis-a-vis other water users, may not retain the right to that quantity of water despite non-use. See United States v. Adair, 478 F.Supp. at 348-49; United States v. Hibner, 27 F.2d at 912.
 
 C.
 
 67
 The district court's holding that Walton has no right to share in water reserved when the Colville reservation was created is reversed. On remand, it will need to determine the number of irrigable acres Walton owns, and the amount of water he appropriated with reasonable diligence in order to determine the extent of his right to share in reserved water.
 
 V. STATE PERMITS
 
 68
 Finally, we consider Walton's claim to water rights based on state water permits. We hold that the state has no power to regulate water in the No Name System, and the permits are of no force and effect.
 
 A.
 
 69
 State regulatory authority over a tribal reservation may be barred either because it is pre-empted by federal law, or because it unlawfully infringes on the right of reservation Indians to self-government. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980); White Mountain Apache Tribe v. Arizona, 649 F.2d 1274 (9th Cir., April 6, 1981). Although these barriers are independent, they are related by the concept of tribal sovereignty. "The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law." Bracker, 100 S.Ct. at 2583.
 
 
 70
 Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory. Id.; United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975).
 
 
 71
 The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.
 
 
 72
 United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (citations omitted).
 
 
 73
 A tribe's inherent power to regulate generally the conduct of non-members on land no longer owned by, or held in trust for the tribe was impliedly withdrawn as a necessary result of its dependent status. Montana v. United States, -- U.S. --, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981). Exceptions to this implied withdrawal exist. A tribe retains the inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the health and welfare of the tribe. Id. This includes conduct that involves the tribe's water rights. See id. at n.15.
 
 
 74
 A water system is a unitary resource. The actions of one user have an immediate and direct effect on other users. The Colvilles' complaint in the district court alleged that the Waltons' appropriations from No Name Creek imperiled the agricultural use of downstream tribal lands and the trout fishery, among other things. Cf. Montana, -- U.S. at --, 101 S.Ct. at 1259 (complaint did not allege peril to subsistence or welfare of tribe from non-Indian hunting and fishing on fee lands).
 
 
 75
 Regulation of water on a reservation is critical to the lifestyle of its residents and the development of its resources. Especially in arid and semi-arid regions of the West, water is the lifeblood of the community. Its regulation is an important sovereign power.
 
 
 76
 Although we need not decide whether this power resides exclusively in the tribe or the federal government, or whether it may be exercised by them jointly, its importance forms the backdrop for our consideration of the pre-emption issue.
 
 B.
 
 77
 We hold that state regulation of water in the No Name system was pre-empted by the creation of the Colville Reservation. The geographic facts of this case make resolution of this issue somewhat easier than it otherwise might be. The No-Name system is non-navigable and is entirely within the boundaries of the reservation. Although some of the water passes through lands now in non-Indian ownership, all of those lands are also entirely within the reservation boundaries.
 
 
 78
 The Supreme Court has held that water use on a federal reservation is not subject to state regulation absent explicit federal recognition of state authority. Federal Power Commission v. Oregon, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955).[15] Thus, in creating the Colville Reservation, the federal government pre-empted state control of the No Name system.[16]
 
 
 79
 In United States v. McIntire, 101 F.2d 650, 654 (9th Cir. 1934), we held that state water laws are not controlling on an Indian reservation:
 
 
 80
 (T)he Montana statutes regarding water rights are not applicable, because Congress at no time has made such statutes controlling in the reservation. In fact, the Montana enabling act specifically provided that Indian lands within the limits of the state, 'shall remain under the absolute jurisdiction and control of the Congress of the United States.'
 
 
 81
 Identical language appears in the Washington Enabling Act, Ch. 180, 25 Stat. 676, 677 (1889).[17]
 
 
 82
 Second, Washington argues the purchase of allotted lands by a non-Indian "severed any special federal trust status." The lands are still part of the reservation, however. The only mention of water rights in the Allotment Act suggests continued federal control. 25 U.S.C. § 381.
 
 
 83
 We adhere to this holding because we find no indication Congress intended the state to have this power. In a series of Acts culminating in the Desert Lands Act of 1877, ch. 107, 19 Stat. 377, Congress gave the states plenary control of water on the public domain. California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 163-64, 55 S.Ct. 725, 731, 79 L.Ed.2d 1356 (1935). Based on this and other legislation, the Supreme Court concluded that Congress almost invariably defers to state water law when it expressly considers water rights. United States v. New Mexico, 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052 (1978).
 
 
 84
 This deference is not applicable to water use on a federal reservation, at least where such use has no impact off the reservation.
 
 
 85
 FPC v. Oregon, 349 U.S. at 448, 75 S.Ct. at 840. The usual policy stems in part from the need to permit western states to fashion water rights regimes that are responsive to local needs, and in part from the "legal confusion that would arise if federal water law and state water law reigned side by side in the same locality." California v. United States, 438 U.S. 645, 653-54, 668-69, 98 S.Ct. 2985, 2989-90, 2997-98, 57 L.Ed.2d 1018 (1978).
 
 
 86
 Neither rationale is applicable here. Where land is set aside for an Indian reservation, Congress has reserved it for federal, as opposed to state needs. Because the No Name System is located entirely within the reservation, state regulation of some portion of its waters would create the jurisdictional confusion Congress has sought to avoid.
 
 
 87
 Public Law 280, Act of August 15, 1953, 67 Stat. 588, did not delegate this regulatory power to the state. Nor do we perceive the McCarran Amendment, 43 U.S.C. § 666, as expanding the state's regulatory powers over water on a federal reservation.
 
 
 88
 Finally, we note that the state's interest in extending its water law to the reservation is limited in this case. Tribal or federal control of No Name waters will have no impact on state water rights off the reservation.
 
 
 89
 Thus, we conclude that Walton's state permits are of no force and effect.
 
 I. CONCLUSION
 
 90
 On remand, the district court will calculate the respective rights of the parties. To the extent Walton's use of water exceeds his rights and interferes with the rights of the tribe, it will be enjoined.
 
 
 91
 REVERSED IN PART, AFFIRMED IN PART, AND REMANDED for proceedings in conformance with this opinion. The parties will bear their own costs on this appeal.[18]
 
 
 
 *
 The Honorable Jesse W. Curtis, Senior District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The Colville Confederated Tribes included the Methow, Okanogon, Sampoil, Nespelem, Lake, and Colville Tribes. See Confederated Tribes of the Colville Reservation v. United States, 4 Ind.Cl.Comm. 151 (1956); I. Kappler, Indian Affairs and Treaties, 915 (2d ed. 1904). In this opinion, they will be referred to as the Tribe or the Colvilles
 
 
 [2]
 Indians who did not live on the land reserved for them were compelled to leave valuable tracts on which they had made extensive improvements and move to the reservation. (1872) Report of the Commissioner of Indian Affairs, 62
 
 
 [3]
 Approximately 1.5 million acres were returned to the public domain. Act of July 1, 1892, 27 Stat. 62
 
 
 [4]
 The reservation remained open for settlement until 1934, when the Secretary of the Interior "temporarily" withdrew the surplus lands pursuant to the Reorganization Act. Congress permanently restored those lands to the beneficial use of the Tribe in 1956. Act of July 24, 1956, Pub.L. No. 84-772, ch. 684, 70 Stat. 626. In passing that Act, Congress acknowledged that the Indians' consent to opening the reservation for settlement was of questionable validity. See. H.R.Rep. No. 2080, 84th Cong., 2d Sess. 2 (1956)
 
 
 [5]
 We assume that none of the Colvilles' allotments ever passed from Indian ownership
 
 
 [6]
 The Tribe asked the United States to intervene on its behalf. Instead, the Justice Department filed a separate suit against Walton, based on the theory that the Secretary of the Interior has exclusive jurisdiction over all the water on the reservation. The trial court consolidated the proceedings sua sponte. The United States filed an appeal from the decision and the Tribe moved "not to be bound" by any ruling on U. S. v. Walton, No. 79-4619. The United States has since dropped its appeal and we deny the Tribe's motion
 
 
 [7]
 The Winters doctrine applies to reservations created by treaty or executive order. Arizona v. California, 373 U.S. 546, 598, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1963)
 
 
 [8]
 For example, the order creating the Colville reservation read:
 It is hereby ordered that the country bounded on the east and south by the Columbia River, on the west by the Okanogan River, and on the north by the British possessions, be, and the same is hereby, set apart as a reservation for said Indians, and for such other Indians as the Department of the Interior may see fit to locate thereon.
 Executive Order of July 2, 1872, reprinted in 1 Kappler, Indian Affairs and Treaties, 916 (2d ed. 1904). Reservations were commonly created with similar language. See U.S. Dept. of the Interior, Federal Indian Law, 613-22 (1958). The President's orders responded to requests from officers in the Department of the Interior but it is difficult to identify or to know how much weight to give to their purpose.
 
 
 [9]
 See United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). The rule of liberal construction should apply to reservations created by Executive Order. See Arizona v. California, 373 U.S. 546, 598, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1963). Congress envisioned agricultural pursuits as only a first step in the "civilizing" process. See, e. g., 11 Cong.Rec. 905 (1881). This vision of progress implies a flexibility of purpose
 
 
 [10]
 See Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918) (exclusive right to fish implied because necessary for self-sustaining community); United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938) (reservation for "absolute and undisturbed use and occupation" includes ownership of minerals and standing timber); Menominee Tribe of Indians v. United States, 391 U.S. 404, 406, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968) (reservation "for a home" includes hunting and fishing rights); and United States v. Finch, 548 F.2d 822, 832 (9th Cir. 1976) (U.S. intended to reserve right of Indians to sustain themselves "from any source of food which might be available.")
 
 
 [11]
 Omak Creek and No Name Creek have no surface connection
 
 
 [12]
 The Indians may be deprived of the use of wells drilled on allotment 526 but those were constructed with the understanding that this litigation would be unaffected
 
 
 [13]
 In Powers, the federal government had constructed an irrigation project on the Crow Reservation capable of irrigating 20,000 acres. Due to a drought and upstream diversions by respondents (non-Indian successors to Indian allottees), 8,000 acres within the project could not be irrigated
 The government sought an injunction against respondents' diversions. The irrigation project had been completed prior to allotment of respondents' lands. The government argued that the project served to "dedicate and reserve" water for irrigation of the 20,000 acres, and that the rights subsequently acquired by Indian allottees were subject to that reservation.
 The Court stated the respondents "succeeded to the interest of the original allottees either by mesne conveyances or by purchase at government sales of deceased allottees' lands." 305 U.S. at 531, 59 S.Ct. at 346. It then recited the government's argument and refuted it, relying in part on section 7 of the Allotment Act, by demonstrating that Indian allottees acquired a right to share in reserved water.
 The Court held the government had shown no basis for the injunction, but did not consider "the extent or precise nature of respondents' rights in the waters." 305 U.S. at 533, 59 S.Ct. at 346.
 If an Indian allottee's right to reserved water does not pass to his or her successor, there would have been a basis for the injunction. Walton therefore argues that Powers holds an allottee's right to reserved water is acquired by his non-Indian successor. The government, however, did not present that issue. The Court rejected the only argument made by the government, i. e., that Indian allottees did not acquire rights to reserved water.
 
 
 [14]
 The subsequent history of the General Allotment Act demonstrates that this protection was extraordinarily inadequate. By the 1930's approximately 90 million acres out of 140 million acres owned by Indian tribes in 1887 had passed into non-Indian ownership. American Indian Policy Review Commission, Final Report 66-70 (1977). This history, however, has no bearing on congressional intent with regard to water rights in 1887; if anything, it demonstrates Congress intended less protection for Indian rights than the rhetoric of the Act's sponsor would suggest
 
 
 [15]
 The FPC had licensed construction of a dam on federal property. The lands that would have been flooded were held by the federal government. They had been reserved either as an Indian reservation or for power generation. The flow of the river would have been undiminished below the dam
 This court held the licensee had to obtain state approval because of the state's control over non-navigable waters on the public domain. 211 F.2d 347 (9th Cir. 1954).
 The Supreme Court reversed. It held that congressional acts giving the states control of water on the public domain were inapplicable on a federal reservation.
 It is a familiar principle of public land law that statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated for some other purpose (I)t is enough for the instant case, to recognize that these Acts do not apply to this license, which relates only to the use of waters on reservations of the United States.
 349 U.S. at 448, 75 S.Ct. at 840 (citations omitted).
 
 
 [16]
 We need not consider what effect the opening of reservation lands for entry and settlement had on the control of water on or appurtenant to such lands. All of the lands here involved were allotted
 
 
 [17]
 The state argues that McIntire is distinguishable for two reasons. First, it argues the court had already held the waters were reserved. It is clear, however, that the court did not rely on this in holding state water law inapplicable on the reservation
 
 
 [18]
 We are persuaded of the correctness of our analysis and conclusion concerning the transferability of the water rights involved in this litigation. Nevertheless, we recognize that reasonable minds hold conflicting views. State and federal courts, state and federal agencies responsible in water rights administration, and the numerous Indian tribes, allottees and their transferees, are plagued almost on a daily basis with the problems and uncertainties surrounding the issues discussed in this opinion. This case presents an appropriate vehicle for the Supreme Court to give guidance and stability to an area of great unrest and uncertainty in Western water and land law. A definitive resolution is overdue. The magnitude of the problem cannot be overstated