Fred HOLLY, et ux., et al., Plaintiffs,

v.

Watson TOTUS, et al., Defendants.

No. C–78–02.

United States District Court,
E.D. Washington.

Sept. 17, 1983.

Donald H. Bond, Halverson & Applegate, Yakima, Wash., for plaintiffs.

James B. Hovis, Hovis, Cockrill, Weaver & Bjur, Yakima, Wash., for defendants.

Charles B. Roe, Jr., Sr. Asst. Atty. Gen., Olympia, Wash., for State of Washington.

## MEMORANDUM AND ORDER GRANTING STATE'S MOTION FOR SUMMARY JUDGMENT

QUACKENBUSH, District Judge.

BACKGROUND:

This action is brought by the State of Washington (State), by the cities of Toppenish and Wapato, by non-Indians, and by corporations allegedly owning land either within or near the Yakima Nation Reserva-

tion within the State of Washington. Defendants originally included the Yakima Indian Nation, the Yakima Tribal Council, all members of the Tribal Council individually and in their official capacities, and the Chief Judge of the Tribal Court, individually and in his official capacity.

Plaintiffs seek to enjoin the application and enforcement of the Yakima Nation Water Code, adopted by the Tribal Council in May, 1977. Soon after the issues were joined, defendants moved to dismiss asserting immunity from suit due to sovereign immunity; asserting the action was not ripe due to failure to exhaust tribal remedies; asserting lack of jurisdiction over defendants; and asserting failure to state a claim. Judge Marshall Neill held that the court had no jurisdiction over the Yakima Indian Nation, over the Yakima Tribal Council, or over the tribal officials in their official capacities. Memorandum and Order, Ct.Rec. 55, at 2. *Accord, Snow v. Quinault Indian Nation,* 709 F.2d 1319, 1321 (9th Cir.1983); *California v. Harvier,* 700 F.2d 1217, 1218 (9th Cir.1983). However, the further holding was that since plaintiffs alleged the tribal officials' authority under the Yakima Water Code is void under federal law, the claims for relief against the tribal officials in their individual capacities were not barred by sovereign immunity. Memorandum and Order, Ct. Rec. 55 at 2 and 3. The Chief Judge of the Yakima Tribal Court was also dismissed. *Id.* at 3.

In addition, Judge Neill concluded that exhaustion of tribal remedies was not required for the claim that the Tribe lacks jurisdiction over plaintiffs' waters. *Id.* at 7. Since the court concluded it had jurisdiction over the issue of whether, under federal law, the Tribe could regulate plaintiffs' waters, the court did not find it necessary at that time to determine whether subject matter jurisdiction existed for the remaining claims. *Id.*

Presently before this court, is the state's Motion for Summary Judgment which challenges the Tribe's authority to regulate Reservation waters which are beyond the scope of water rights created by the United States for the Tribe.

FACTS:

At Ct.Rec. 108, all parties to this action stipulated, for the limited purpose of the State's motion, to the following statement of undisputed facts:

"1. The Yakima Indian Reservation was established and reserved by treaty with the United States in 1855 (12 Stat. 951).

"2. The Confederated Tribes and Bands of the Yakima Indian Nation, herein called the 'Yakima Indian Nation', has been recognized as an Indian tribe by the Secretary of the Interior. The Yakima Tribal Council is the governing body of said tribe and is so recognized by the Secretary of the Interior.

"3. The individual defendants are elected and duly qualified and acting members of the Yakima Tribal Council. As members of the Yakima Tribal Council, they collectively prepared, promulgated, and made effective the Yakima Nation Water Code. Resolution No. T–79–77. [A copy is set forth in Exhibit A at Ct.Rec. 108.] This code applies to all areas within the Yakima Indian Reservation. The scope of coverage of the Code as intended by the Yakima Indian Nation includes the Glenwood area.

"4. The Glenwood area is an area of 100,457 acres located in the south-central part of the State of Washington and immediately southeast of Mount Adams. Beginning in the 1880s, it was substantially and predominantly settled by non-Indians. Patents were issued to these settlers by the United States in the late 19th or early 20th century under the federal homestead laws on the assumption that the land in this area was part of the public domain. In 1947 the Yakima Tribe filed a claim with the Indian Claims Commission of the United States demanding compensation for these and other lands on the ground that there had been a taking under the power of eminent domain or a violation of the 5th Amendment to the United States Constitution. Petition filed June 21, 1949. *The Yakima Tribe v. U.S.,* Indian Claims Commission Docket No. 47. It was asserted that these lands were part of the Yakima Indian Reservation, that patents had been issued and the

lands otherwise disposed of inadvertently and that the assumption that the lands were part of the public domain was erroneous. *Id.* The claim was upheld as to a 121,466 acre tract [Tract D]. 16 Ind.C. Cmsn. 426. A 21,009 acre portion of that tract was severed into a separate claim. The remainder of the tract is what is identified here as the Glenwood area. It was agreed by the Tribe and the United States that vacant and unpatented lands in the Glenwood area, containing some 2,548 acres, were to be returned to the tribe. These lands were eliminated from the money portion of the claim. The claim for money judgment was agreed to apply to the remaining 97,909 acres which had been patented. 20 ICC 76, 77, 78, 79. The United States was found liable on the claim for the patented acres. The Yakima Tribe received a judgment for this and other claims in a consolidated judgment. 20 ICC 90, 95, 96. None of the plaintiffs were parties to the proceedings before the Indian Claims Commission.

"5. The Yakima Indian Reservation, exclusive of the Glenwood area, contains 1,223,844 acres. This land is held as follows:

| | |
|---|---|
| Tribal land and allotted land held in trust by the United States | 1,121,220 acres |
| Fee land held by Indians | 3,202 acres |
| Fee land held by non-Indians | 99,422 acres |
| TOTAL | 1,223,844 acres |

For the most part the fee lands held by non-Indians were transferred to non-Indians pursuant to the Federal Allotment Acts. The land ownership of the Yakima Indian Reservation is set forth on Exhibit B [to Ct.Rec. 108], a map of the Yakima Indian Reservation prepared by the Bureau of Indian Affairs.

"6. The non-governmental plaintiffs are non-Indian citizens of the State of Washington. They claim ownership of the land and are users of water in the Glenwood area.

"7. Plaintiff State of Washington is a state of the United States, admitted to the Federal Union in 1889. It (through various state departments) claims ownership of

land and water rights and is a user of water in the area which the Yakima Nation claims is within the purview of the Yakima Nation Water Code. The State of Washington, through the Department of Ecology, administers the state's water right laws.

"8. In relation to the use of water within the Glenwood area, several individual plaintiffs hold permits or certificates issued by the State of Washington pursuant to Chapter 90.03 R.C.W. or otherwise claim the right to use waters within the Glenwood area based on state law. Several individual plaintiffs also claim rights to use the water within the Glenwood area pursuant to decree of the Klickitat County Superior Court issued in accordance with the general adjudication procedures of Chapters 90.03 or 90.44 R.C.W. or rights established otherwise under state law. *In the Matter of the Determination of the Rights to the Use of the Waters of Bird and Braser Creeks. State v. Bartholomew, et al.,* Klickitat County Washington Superior Court Decree entered March 14, 1921. Exhibit C [to Ct.Rec. 108]. For more than 50 years waters have been allocated in accordance with this decree.

"9. The Yakima Indian Nation and its members have reserved treaty water rights to the use of waters within the exterior boundaries of the Yakima Indian Reservation. See *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).

"10. The Yakima Indian Nation has promulgated that all of the waters that underlie, arise upon or flow through or along the border of the Yakima Indian Reservation are reserved for the beneficial use of its members as needed. At the present time, however, parts of those waters are used both within and outside the boundaries of the Reservation by non-Indians.

"11. The United States Department of the Interior has neither approved the Yakima Water Code nor, at any time, adopted any comprehensive code or regulation purporting to allocate or regulate waters within the reservation. The Yakima Indian Nation has been advised that the Yakima Nation Water Code will not be approved by

the Department of the Interior until regulations are adopted by it pursuant to 25 U.S.C. § 381. Since enactment of 25 U.S.C. § 381 by Congress in 1887, the Department of the Interior has failed to adopt such regulations.

"12. Enforcement of the Yakima Nation Water Code has been stayed since the inception of this case. The Yakima Nation Water Code has not, at any time, before the commencement of this suit or thereafter, been enforced by the Yakima Indian Nation against any of the plaintiffs."

The tribal officers argue in their brief that *all* waters flowing through the Reservation are reserved waters. However, these defendants have not submitted an affidavit sufficient to controvert Eugene F. Wallace's affidavit, at 4, paragraph 9, which serves to establish for purposes of this motion only the existence of "excess" waters, discussed *infra*, located on non-Indian lands within the Reservation. Importantly, the undisputed facts do not reveal what portion of the waters should be deemed excess for purposes of this motion, but it is undisputed that the state has for many years been applying its water rights laws to various waters on the Yakima Reservation and others through issuance of water rights permits and certificates. Wallace affidavit at 2 and 3, paragraphs 2–5. Finally, defendants argue that plaintiffs have not submitted evidence of non-Indian ownership of lands within the Reservation. However, defendants stipulated in Ct.Rec. 108 that 99,422 acres of land within the Reservation, exclusive of the Glenwood area was non-Indian fee land. See, also, Exh. B to Ct.Rec. 108. In the affidavit of James B. Hovis, Ct.Rec. 123 at 5, it is stated that "[I]t is not possible from the facts now put forth in this motion to determine whether any of the [Toppenish and Wapato] lands have been acquired underneath the General Allotment Act of 1887 but it appears under the facts that your affiant knows at this time that no such lands were acquired underneath the General Allotment Act." In the face of defendants' stipulation, this statement is insufficient to raise a material factual issue of whether title passed when lands were acquired within the reservation under the General Allotment Act. To summarize, for purposes of this motion, it is undisputed that excess waters and non-Indian fee lands exist within the Reservation.

STANDING:

■ Defendants challenge plaintiffs' standing to bring this action. The current definition of standing is two-pronged. First, in its constitutional dimension, there must be justiciability, that is, a case or controversy within the meaning of Article III of the United States Constitution. Hence, the plaintiffs must allege "some threatened or actual injury resulting from the putatively illegal action", *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Secondly, apart from the Article III requirement, the statutory provision must be understood as granting persons in plaintiffs' positions a right to judicial relief ("zone of interest" requirement). 422 U.S. at 500, 95 S.Ct. at 2205. So long as these two prerequisites are met, plaintiffs may invoke the general public interest in support of their claim. *Id.*

■ Finally, where at least one plaintiff has standing, it is unnecessary to decide the standing of other plaintiffs. *Watt v. Energy Action*, 454 U.S. 151, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1982); *Village of Arlington Heights v. Metropolitan*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). Plaintiffs allege possessory and title interests in real property to which administration of the Yakima Nation Water Code allegedly represents an immediate threat of injury. The allegations are sufficient for this court to find standing in the plaintiffs.

DISCUSSION:

A. *Tribal Criminal Judicial Jurisdiction*

■ At the outset, the court must conclude, even assuming that enactment of a comprehensive code for regulating all waters touching the Reservation is within the sovereign power of the Tribe, that Section

XIX purports to give the Tribe criminal judicial jurisdiction over non-Indians. The section instructs:

> Violation of any provisions of this code or any regulations or proclamations issued thereunder shall be punishable in the Yakima Tribe Court for each and every offense, by a penalty or punishment not greater than imprisonment for a term of six months or $500 or both.

Clearly, under *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), decided after enactment of the code at issue, such exercise of jurisdiction is "inconsistent with [the] status" of the Yakima Indian Tribe. 435 U.S. at 208, 98 S.Ct. at 1020. Because the offending section is not severable, it also precludes enforcement of the remainder of the resolution. Succinctly, under *Oliphant*, absent congressional mandate or treaty provision, tribal jurisdiction to try non-Indian defendants criminally was necessarily terminated by the "dependent" relationship created when tribes "submitt[ed] to the overriding sovereignty of the United States". *Id.* at 210, 98 S.Ct. at 1021. Two weeks later, the Supreme Court referred to this manner of losing inherent sovereign power as "implicit divestiture of sovereignty". *United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978). Here, as in *Oliphant*, the Tribe may not rely upon its Treaty for the proposition that the Tribe has not submitted to the overriding sovereignty of the United States, because in that document, the Yakima Nation "acknowledge[d] [its] dependence on the government of the United States". *Oliphant*, 435 U.S. at 207, 98 S.Ct. at 1020. Nor has this court been cited to a federal statute guaranteeing the Tribe criminal jurisdiction over non-Indians within the Reservation. *Id.* at 197, 98 S.Ct. at 1015. Consequently, since the resolution permits the tribal court to imprison non-Indians for violation of the water code, and to otherwise criminally punish non-Indians, its enactment was outside the power of the Tribe Council.

Having determined as a matter of law that the resolution as presently written may not be enforced, it is unnecessary and indeed inappropriate to definitively rule upon whether the Yakimas' code absent the penalty section, is a proper exercise of civil regulatory jurisdiction. Nevertheless, some observations should be made.

Perhaps in no other field of civil litigation, are there as many "problems and uncertainties surrounding the issues" as there is in the increasingly difficult area of water rights administration. *See Colville Confederated Tribes v. Walton*, 647 F.2d 42, 54 n. 18 (9th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981) (*Walton II*). When the United States sets aside a reservation of land, it impliedly reserves water then unappropriated in sufficient quantity to accomplish the purposes of the federal reservation. *United States v. New Mexico*, 438 U.S. 696, 698–700, 98 S.Ct. 3012, 3013–14, 57 L.Ed.2d 1052 (1978). Indian tribes hold reserved water rights under the *Winters* doctrine. *Winters v. United States*, 207 U.S. 564, 577, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). Unlike appropriative rights created under state law, which are defined by actual diversion and continued beneficial use of waters from natural channels, Indian *Winters* rights reserve a paramount right to the use of as much water which is in contact with the reservation as is needed to fulfill the primary purposes for which the land was reserved. *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). Unlike state created rights, which are prioritized according to the date of appropriation, and which are lost through disuse, *Winters* rights are subject only to appropriative rights which were vested prior to establishment of the reservation, and which non-*Winters* rights were not lost through non-use. *United States v. Ahtanum Irrigation District*, 236 F.2d 321 (9th Cir.1956), *cert. denied*, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957) (*Ahtanum I*). "Excess" waters are those stream waters which are over and above those used to satisfy reserved *Winters* water rights. *Id.* at 327.

The gist of the state's motion is that, assuming the Tribe has the power generally to enact a water administration code, the enactment may not extend beyond the scope of the *Winters* water rights reserved for the Tribe. That is, the state maintains that the Tribe is not empowered to allocate excess waters in the stream systems.

### B. *Tribal Self-Government*

 To determine whether the Yakima Nation's inherent sovereign power is sufficient to apply its water code within the Reservation to nonmembers of the Tribe on fee lands using excess waters requires analysis under *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). As discussed earlier, Indian tribes possess sovereign power over their members and their territory, *Id.* at 563, 101 S.Ct. at 1257, but due to their "original incorporation into the United States", exercise of tribal power beyond that necessary to protect tribal self-government was deemed inconsistent with this "dependent status" and therefore was held not to survive without express congressional delegation. *Id.* at 564–65, 101 S.Ct. at 1257–58. Because tribes may not exercise power inconsistent with this diminished sovereign status, Indians have lost the right to govern nonmembers residing within Reservations except in certain instances. *Id.* at 565, 101 S.Ct. at 1258. One exception exists where nonmembers enter into consentual relationships with a tribe or its members. *Id.* at 565, 101 S.Ct. at 1258. More importantly in this case, a tribe also retains inherent power to civilly regulate the conduct of non-Indians on fee lands "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566, 101 S.Ct. at 1258. Of significance, this circuit has held that conduct threatening the health or welfare of the tribe may include conduct involving the tribe's water rights. *Walton II*, 647 F.2d at 52. In *Walton* this was so because a non-Indian's water appropriation was alleged to have imperiled the Tribe's downstream use of agricultural and fisheries water. *Id.* Under its narrow ruling, the *Walton* court found it unnecessary to decide whether the power to regulate resided exclusively in the tribe, in the federal government, or whether it was to be exercised jointly. *Id.* Nevertheless, the importance of the exclusivity of regulatory power, or the lack of it, was considered by the court in analyzing whether the state, in that case, was additionally pre-empted from regulating excess waters within the adjudicated stream system. That stream system was small, non-navigable, and flowed entirely within the Reservation. Although some land served by the system was in non-Indian ownership, it was also within the Reservation boundaries. *Id.* Finally, the non-Indian lands were purchased allotted lands rather than public domain lands. Thus, in using a pre-emption analysis, the *Walton* appellate court concluded the state could not regulate the stream system at issue, because tribal or federal control did not impact off-reservation state water rights. See *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980) (Analysis of whether a state may regulate non-Indian conduct on a Reservation requires "a particularized inquiry into the nature of the state, federal and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.") In this case, the state argues that while the state regulatory jurisdiction question need not be resolved for determining whether the Tribe has the power to administer a comprehensive code, a ruling on state regulation, and therefore, analysis under the pre-emption mode, is not irrelevant because the state jurisdiction question forms an important backdrop in analyzing the extent of tribal power. In this case, a preemption analysis could result in a different conclusion from that reached in *Walton*. See, *e.g.*, *United States v. Anderson*, 591 F.Supp. 1 (E.D. Wa.1982), appeal pending. Here, the various water systems are not wholly contained within the Reservation and for the most part have never been generally adjudicated, but currently are undergoing general adjudication in state court, a forum

which Congress has explicitly deemed competent to adjudicate Indian water rights. 43 U.S.C. § 666 (McCarran Amendment); *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983). See, also, *State v. Aquavella*, Yakima County Superior Court Cause No. 77–2–01484–5 (Stauffacher, J.) Here, too, some of the non-Indian owned lands which the Tribe seeks to regulate were arguably acquired as part of the public domain rather than purchased under the General Allotment Act (Dawes Act) of 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.*

Despite the fact the Yakima Nation has not adopted the Indian Reorganization Act, 25 U.S.C. § 476 [1], the question remains under the General Allotment Act, 25 U.S.C. § 381, of the extent the power vested in the Secretary of Interior may erode, displace, or otherwise supercede the Tribe's perceived inherent power to administer a comprehensive water code. Section 381 authorizes the Secretary of Interior to act to assure just and equal distribution of water among Indians where water is necessary for "agricultural purposes". Where, as here, some of the plaintiffs are non-Indian successors to allottees' interests, a ruling upon the applicability of Sec. 381 may become necessary. The trial court in *Walton* concluded that "the [Colville] Tribe must enjoy independent authority to regulate tribal waters, with the Secretary of Interior, pursuant to 25 U.S.C. § 381 having concurrent jurisdiction to assure that the water is divided in a just and equal manner among the Indians on the reservation". *Colville Confederated Tribes v. Walton*, 460 F.Supp. 1320, 1332 (E.D. Wa.1978). (*Walton I*), rev'd on other grounds, 647 F.2d 42 (9th Cir.1981) (*Walton II*), cert. denied, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). However, the trial court further reasoned that state jurisdiction over excess waters would not infringe on the Indians' right to self-government.

*Id.* at 1333. The reviewing court in determining that state jurisdiction was pre-empted, noted that Sec. 381 "suggest[ed] *continued federal control,*" *Id.* at 53 n. 17 (emphasis added). In declining to pass upon the question of exclusivity of regulatory jurisdiction with respect to the Tribe or the federal government, but in finding federal "control" for preemption purposes, the problem of defining the relationship of the Secretary of Interior and the Tribe remains as obtuse, and problematic as before *Walton.*

One recent commentator concisely summarized the interests of the tribal, federal, and state sovereigns:

> The federal government, like the tribes themselves, has an interest in assuring tribal sovereignty. However, the federal government also has an interest in protecting the rights of the non-Indian successors of the Indian allottees. The allotment policy pursuant to which much reservation land was originally allotted to Indians, and later transferred to non-Indians, was also a federal policy, although it has since been abandoned. Reservation lands not allotted to Indians were opened to non-Indian settlers by the federal government. The General Allotment Act manifested an intention to provide water for the Indian allottees by stipulating that a "just and equal distribution" of water be made among Indian allottees pursuant to regulations by the Interior Secretary. [25 U.S.C. § 381] Other laws provided for the acquisition of water rights on reservations by Indian allottees and non-Indian settlers pursuant to state law.
>
> The laws passed by Congress have never provided a federal water law system. The reserved rights doctrine grew up as a part of Indian law and the extent of its applicability to the rights of non-Indian successors to Indian allottees was not

---

1. Recently, the Supreme Court opined that Tribes organized under the Indian Reorganization Act, 25 U.S.C. §§ 476, 477, in the context of enacting ordinances to regulate taxation of non-Indians within Reservation boundaries, were required to obtain approval from the Secretary of Interior before the ordinance "could take ef-

fect". *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). *But see, Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 599 (9th Cir.1983) ("Neither *Merrion* nor the language of the IRA requires a tribe to adopt a constitution before exercising civil jurisdiction over non-Indians".)

certain. Although the Supreme Court held as early as 1939 that these settlers did have some right to reserved waters, the Court failed to fully define the precise nature of these rights. In the absence of a system of federal water law, non-Indian settlers would of necessity have had to rely on state water law as the only operative law under which they could obtain water rights. Assertions of Indian sovereign rights to regulate excess water within reservation boundaries is a fairly recent development.

Lastly, a state has an interest in regulating water rights acquired pursuant to its own laws, as well as in regulating water on reservations which affects the ability of the state to manage water development of streams flowing off the reservations.

Therefore, it appears that states and Indian tribes have analogous claims to regulating excess water on reservation lands. The Indian tribes have an interest in protecting the reserved waters to which they are entitled, and the states would want to safeguard the off-reservation waters which they administer. The Indian tribes would, of course, have the pre-eminent claim in exercising sovereignty on reservation lands, just as states may not be interfered with in the exercise of their sovereignty off the reservations. This by no means implies, however, that substantive rights acquired under state law should not be enforced by tribes. The optimal solution would be an arrangement whereby the states and tribes agree to enforce each other's laws. A bill to permit states and tribes to enter into such compacts is currently before Congress. In the absence of such an arrangement, a court appointed water master may protect the state substantive rights of non-Indians on reservations while otherwise permitting tribal regulatory authority over reserved water.

Hostyk, *Who Controls the Water? The Emerging Balance Among Federal, State and Indian Jurisdictional Claims and Its Impact on Energy Development in the Upper Colorado and Upper Missouri River Basins*, 18 TULSA L.J. 1, 77 (1982). This same treatise writer has also expressed an opinion relevant to the conceptual dispute between defendants and plaintiffs in this case as to whether the contested right to regulate waters should be analyzed under an "ownership" model or a "right to use" (usufruct) mode of analysis:

> [A problem] is how to define the quantum of water which the federal government, state governments, and Indian tribes control. Commentators have pointed out that concepts of "ownership" are not of much use in this context. For example, a state claiming ownership of water is merely using legal shorthand to claim sovereignty over the water to enact laws to either adjudicate the rights of its citizens to water, reserve it for state governmental purposes, or conserve it for future generations. The federal and Indian exercise of sovereignty over water appropriated pursuant to the federal law of reserved rights is more limited than the exercise of state sovereignty over waters, although arguably the discretion of Indian tribes in the exercise of their sovereignty over such appropriated water should be greater than that of the federal government. The attempt to found federal and Indian claims to water on federal "ownership" of the public domain ultimately rests upon the discredited notion of the common law as a transcendent system of property rights to be respected by the courts or legislatures. Legal systems are now recognized to be whatever the sovereign enacts as law pursuant to the United States Constitution. Congress has never enacted legislation mandating common law riparian rights in the West. [Footnote references omitted.]

*Id.*

Thus, if this court is called upon to define the scope of the Tribe's regulatory power in the unique context of overlapping sovereign interests, the issues will undoubtedly be numerous, multi-layered, and not necessarily capable of an exacting solution. It may be that the United States must be aligned as a party for the purpose

of ascertaining the scope of the federal interest and the necessity, if any, for federal oversight of tribal regulation. Because this species of litigation represents such an "unwieldly" task for all, the earlier quoted commentator concluded his treatise by observing "[i]t is to be hoped that the rationalization of water uses may be hastened by good faith negotiations between the parties, particularly between the [S]tate[ ] and the Indian [T]ribe[ ]". *Id.* at 78.

For the reasons set forth, the state's Motion for Summary Judgment is GRANTED. The Yakima Nation Water Code shall not be enforced.