# CIRCUIT COURT OF THE CITY OF NEWPORT NEWS

Mattaponi Indian Tribe et al.

v.

Commonwealth of Virginia et al.

February 5, 2007

Case No. 3001-RW/RC

BY JUDGE CHARLES E. POSTON

The Supreme Court of Virginia consolidated these actions in *Alliance to Save the Mattaponi v. Commonwealth*, 270 Va. 423, 621 S.E.2d 78 (2005), all of which dealt with issues concerning plans by the Defendant localities to construct the King William Reservoir Project ("Reservoir"). All of the issues presented were resolved except one, the Mattaponi Indian Tribe's claims against the City of Newport News under the 1677 Treaty at Middle Plantation ("Treaty") between King Charles II and the predecessors of the Mattaponi Indian Tribe. The Circuit Court held that, while Virginia law governed the Tribe's Treaty claims, the Circuit Court lacked jurisdiction to try any claims made under the Treaty. The Supreme Court of Virginia agreed that Virginia law governs the Tribe's Treaty claims, yet held that the Circuit Court indeed has jurisdiction to decide them. The Supreme Court then remanded the case for trial of the issues between the Tribe and the City of Newport News.

Upon remand, the Court granted the Plaintiffs' ("Tribe") motion to file an Amended Complaint and to add as parties defendant all of the localities having an interest in the project, including the City of Williamsburg, James City County, King William County, New Kent County, and York County. These localities, together with the City of Newport News, are the Defendants to this action. Pursuant to a settlement agreement, the City of Williamsburg, James City County, Kent County, and York County have agreed with the Tribe to be bound by all rulings of the Court. Today the Court addresses the several motions that are ripe for decision.

## Factual Background

The Mattaponi Indian Tribe claims approximately four hundred and fifty enrolled members, approximately sixty-five of whom live on the Mattaponi Reservation ("Reservation"), which is situated on the Mattaponi River in eastern Virginia. Although the Tribe is not formally recognized by the United States, it is recognized as a legitimate Indian tribe by the Commonwealth of Virginia. The Reservation was initially set aside by an act of the colonial government of Virginia in 1658. The 1677 Treaty at Middle Plantation affirmed the existence of this Tribal land, and the Reservation is maintained today under the laws of Virginia.

The King William Reservoir Project proposes to build a large reservoir upstream from the Mattaponi Reservation for the purpose of supplementing the water supplies of the City of Newport News and neighboring localities. The Reservoir will draw water from the Mattaponi River into its location on Cohoke Creek, a tributary of the Mattaponi River. In its opinion, the Supreme Court of Virginia rendered a detailed factual account that more completely describes the project's history to this point. *See Alliance to Save the Mattaponi v. Commonwealth*, 270 Va. 423, 621 S.E.2d 78.

The Tribe asserts that construction of the Reservoir would encroach upon certain rights it enjoys under the 1677 Treaty at Middle Plantation, specifically the rights to hunt, fish, and gather, as described in Article VII of the Treaty. Moreover, the Tribe asserts that the Reservoir's construction will unlawfully infringe on the rights it possesses in and to the waters of the Mattaponi River. The Tribe seeks to protect its water rights under the principles of both riparian rights and the reserved water rights doctrine. The Tribe forcefully claims that the Mattaponi River is essential to its ancient heritage and its spiritual identity, as well as to its economic livelihood.

In their pretrial filings, the Defendants deny that the Reservoir will infringe on any rights the Tribe may have under Article VII of the Treaty. The Defendants also claim that the doctrine of reserved water rights has no application in Virginia and, thus, does not afford the Tribe a basis for relief.

Although the City of Newport News and King William County advanced the motions before the Court, the remaining localities are bound by the Court's rulings on these motions, and therefore the Court will refer to the Defendants collectively. Furthermore, the Court recognizes that, while the Tribe has nonsuited both the Article VII and the reserved water rights claims as to King William County, the Tribe maintains those claims against the remaining Defendants.

The Court will address the following motions:

1. Defendants' demurrer to the Tribe's assertion of rights under Article VII of the Treaty;

2. Defendants' motion for summary judgment with respect to the Tribe's assertion of rights under Article VII of the Treaty;

3. Defendants' demurrer to the Tribe's assertion of reserved water rights; and

4. Defendants' motion for summary judgment with respect to the Tribe's assertion of reserved water rights.

*Analysis*

It is well established that a demurrer admits the truth of properly pleaded facts. *Rosillo v. Winter*, 235 Va. 268, 270, 367 S.E.2d 717, 717 (1988). It tests the legal sufficiency of the facts pleaded, and, when deciding a demurrer, the "court must consider the pleading in the light most favorable to the plaintiff and sustain the demurrer if the pleading fails to state a valid cause of action." *Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 303, 618 S.E.2d 331, 333 (2005).

Under Rule 3:18 of the Rules of the Virginia Supreme Court, either party may make a motion for summary judgment and the trial court may grant the motion if it appears that the moving party is entitled to judgment in his favor as a matter of law. Va. Sup. Ct. R. 3:18. A trial court of this Commonwealth, in considering a motion for summary judgment, must adopt all reasonable inferences from the facts that are most favorable to the nonmoving party, unless these inferences are forced, strained, or contrary to reason. *Dickerson v. Fatehi*, 253 Va. 324, 327, 484 S.E.3d 880, 882 (1997) (citing *Carson v. LeBlanc*, 245 Va. 135, 139-40, 427 S.E.2d 189, 192 (1993)). Summary judgment is authorized only when the moving party is entitled to

judgment as a matter of law and is appropriate only if the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Id.* Summary judgment shall not be entered if any material fact is genuinely in dispute. Va. Sup. Ct. R. 3:18.

*Article VII of the Treaty at Middle Plantation*

The Defendants' demurrer and motion for summary judgment both deny that the Reservoir's construction will infringe on any rights the Tribe may enjoy under the Treaty. Article VII of the Treaty, the provision of the Treaty at issue, reads:

> That the said Indians have and enjoy theire wonted conveniences of Oystering, fishing, and gathering Tuccahoe, Curtenemmons, wild oats, rushes, Puckoone, or any thing else for their natural Support not usefull to the English, upon the English Devidends. . . .

The parties' respective positions regarding Article VII are relatively clear. The Tribe asserts that the Treaty's language clearly protects the Tribe's fishing rights and that the Reservoir's effects on its ability to exercise those rights would clearly be adverse and severe. In particular, the Tribe sees Article VII as protecting its aboriginal fishing practices so long as the exercise of those rights does not interfere with the settlers' fishing and gathering rights. Any protection of things "useful to the English," the Tribe argues, could apply only to those activities *then contemplated* by the parties entering into the Treaty, as evidenced by the language of the treaty. Thus, the Tribe does concede that the Commonwealth of Virginia, as successor to the English crown's rights and obligations under the Treaty, retains some fishing and gathering rights under the Treaty.

In the Tribe's view, however, the Treaty does not permit the Commonwealth to develop the land in a manner that would adversely affect the Tribe's rights, but rather acts only to prevent the Tribe from interfering with the Commonwealth's ability to fish and gather. According to the Tribe, the Reservoir's construction would adversely affect the Tribe's fishing rights protected by the Treaty, and furthermore, the construction would be clearly outside the scope of any fishing, hunting, and gathering rights retained by the Commonwealth under Article VII of the Treaty.

On the other hand, the Defendants claim that the Tribe's claimed Treaty rights are not so extensive as to prevent the building of the Reservoir. They argue that any rights bestowed upon the Tribe under Article VII of the Treaty

are specifically restricted by the words "not useful to the English *upon the English Devidends*." To be sure, the Defendants place substantial emphasis on the language "English Devidends" as giving the settlers, and by succession the Commonwealth, the predominant right to make use of the land as they see fit, without concern for any interests of the Tribe. Thus, the Defendants assert that the Tribe is granted limited "oystering, fishing, and gathering" rights to the extent that the exercise of those rights does not interfere with the "settlers' use of the land." The Defendants consequently hold that any Treaty rights enjoyed by the Tribe cannot prevent the Reservoir's construction, because such a denial would interfere with the Commonwealth's preferred use of the land.

The Treaty itself is not a document of mere historical interest. In its opinion remanding this action for trial, the Supreme Court of Virginia said, "the language of the Treaty itself guaranteed to the Indians the right to obtain full relief as permitted under the law." *Alliance to Save the Mattaponi*, 270 Va. at 457, 621 S.E.2d at 98. Therefore, the Treaty certainly provides a legally cognizable basis for relief under Virginia law. The Tribe contends that the construction of the Reservoir will infringe on its rights claimed under the Treaty. Assuming that its factual contentions are true, as the Court must for purposes of deciding this demurrer, the Tribe has sufficiently asserted a right to relief under Article VII of the Treaty to protect it from a violation of its claimed Treaty rights. Therefore, the demurrer will be overruled.

The merits of the Tribe's Article VII claim, to be sure, hinge on the interpretation of the Treaty. The Treaty, written over three centuries ago, contains language that is, in some respects, archaic and perhaps attributes meanings to words that are defined differently in today's understanding of the English language. The parties, through the pleadings and other materials, have each presented support for viable alternative interpretations of the Treaty. The numerous possible interpretations of the Treaty illustrate a latent ambiguity in the Treaty's language. This latent ambiguity reflects a dispute of material fact as to the meaning of language of the Treaty, especially when drawing all reasonable inferences from the language that are favorable to the Tribe.

Even if the Court assumes that all parties agree to the definitions of the Treaty's words and phrases, factual issues concerning the meaning and intent of the Treaty's provisions remain. This holds true regardless of what canons of interpretation this Court may apply to the Treaty. The Tribe noted at oral argument that the interpretation of a treaty is typically finalized only after trial or a thoroughly developed record on summary judgment. *E.g., Menominee Indian Tribe v. Thompson*, 922 F. Supp. 184, 196 (D. Wis. 1996) (citations

omitted). The 1677 Treaty is no different. Because the factual record is not sufficiently developed at this point, there are unresolved factual issues that render summary judgment improper.

Whether relating to the ambiguous nature of the Treaty's language or the intent and meaning of its provisions, the factual record is incomplete and ripe with contention. Thus, the Court will also deny the Defendant's motion for summary judgment with respect to Article VII of the 1677 Treaty at Middle Plantation.

## Reserved Water Rights

The Defendants, through their demurrer and motion for summary judgment, seek dismissal of the Tribe's assertion of reserved water rights as a basis for relief. Currently, the reserved water rights doctrine has been applied exclusively in the federal context, and only in those jurisdictions that base water rights on the prior appropriation system. The reserved water rights doctrine has not been applied, nor its suitability formally addressed, in states like Virginia that subscribe to a riparian water rights system. It is undisputed that the reserved rights doctrine has been, to this point, applied exclusively in the federal context.

Thus, the Tribe's claim for relief under reserved water rights is a clearly a question of first impression in the Commonwealth of Virginia. Indeed, the Court is unaware of any precedent relating to reserved water rights from any jurisdiction that is exclusively riparian. In addressing such a novel and complex question, it is necessary to first discuss the basic tenets of riparian and prior appropriation systems of water rights, as well as the pertinent differences between the two systems.

### I. *Riparian Rights*

In eastern states, the riparian rights doctrine prevails as the legal framework for mediating competing demands for the waters of rivers and lakes. It is, in large measure, a self-regulating system that authorizes proportional use of water among riparian owners in times of plenteous water supply, as well as in periods of scarcity. *Tyler v. Wilkinson*, 24 F. Cas. 472 (C.C. D. R.I. 1827)), is often cited as the legal origin of the American common law riparian rights doctrine. In that case, Mr. Justice Story summarized the riparian rights doctrine:

> Prima facie every proprietor upon each bank of a river is entitled to the land, covered with water, in front of his bank, to the middle thread of the stream, or, as it is commonly expressed, *usque ad filum aquae*. In virtue of this ownership, he has a right to the use of the water flowing over it in its natural current, without diminution or obstruction. But, strictly speaking, he has no property in the water itself; but a simple use of it, while it passes along. The consequence of this principle is, that no proprietor has a right to use the water to the prejudice of another. It is wholly immaterial, whether the party be a proprietor above or below, in the course of the river; the right being common to all the proprietors on the river, no one has a right to diminish the quantity which will, according to the natural current, flow to a proprietor below, or to throw it back upon a proprietor above.

*Id.* at 474.

The essence of the American common law riparian rights doctrine is that those whose lands abut a stream or lake have, as an incident of ownership of the land, the right to reasonable use of the water, and thus may not use the water in any manner that is unreasonably harmful to another riparian owner. *See id. See also Town of Purcellville v. Potts*, 179 Va. 514, 520-22, 19 S.E.2d 700, 702-03 (1942). Accordingly, the principle of reasonable use controls the regulatory scheme in a common law riparian rights system.

A riparian right, stemming from the ownership of land abutting a water source, is itself a valuable property right. *Taylor v. Commonwealth*, 102 Va. 759, 771, 47 S.E. 875, 880 (1904). Indeed, riparian rights "are in no sense easements, but are qualified property rights incident to the ownership of the soil through or by which the waters of a stream flow." *Hite v. Luray*, 175 Va. 218, 226, 8 S.E.2d 369, 373 (1940) (citations omitted). As such, a riparian right is a proper subject for protection by injunction and injury thereto entitles the owner to damages. *Thurston v. Portsmouth*, 205 Va. 909, 912, 140 S.E.2d 678, 680 (1965) (citations omitted). Furthermore, if a riparian right is sought for public use, it may be taken by eminent domain. *Id.* (citing *Town of Purcellville v. Potts*, 179 Va. 514, 522-23, 19 S.E.2d 700, 704 (1942)).

Like most eastern states, Virginia embraces the law of riparian rights. Early Virginia courts defined the rights bundled in the phrase "riparian rights" as several:

First. The right to be and remain a riparian proprietor and to enjoy the natural advantage thereby conferred upon the land by its adjacency to the water.

Second. The right of access to the water, including a right of way to and from the navigable part.

Third. The right to build a pier or wharf out to navigable water, subject to any regulations of the state.

Fourth. The right to accretion or alluvium.

Fifth. The right to make a reasonable use of the water as it flows past or laves the land.

*Taylor v. Commonwealth*, 102 Va. at 773, 47 S.E. at 880-81.

The Supreme Court of Virginia later expanded its explanation of the fifth right listed above, quite possibly the most essential in the bundle of rights, by quoting Professor Minor with approval:

The well settled general rule on this point is that each riparian proprietor has *ex jure naturae* an equal right to the reasonable use of the water running in a natural course through or by his land for every useful purpose to which it can be applied, whether domestic, agricultural, or manufacturing, provided it continues to run, after such use, as it is wont to do, *without material diminution* or alteration and *without pollution;* but he cannot diminish its quantity materially or exhaust it (except perhaps for *domestic* purposes and in the *watering of cattle*) to the prejudice of the lower proprietors, unless he has acquired a right to do so by grant, prescription, or license.

*Town of Purcellville*, 179 Va. at 520-21, 19 S.E.2d at 702-03 (quoting *Minor on Real Property* § 55, at 76 (2d ed. 1928)). It is critical to recognize that the court in *Purcellville* confirmed that a riparian proprietor's reasonable use of water, pursuant to his riparian rights, involves a concern for both the quantity and the quality of the water affected through such use. *Id.*

Indeed, a significant disputed fact before the Court concerns the Reservoir's effect on the quality of the water in the Mattaponi River downstream of the Reservoir's intake. The Defendants assert that because the river is tidal, the quantity and quality of water will remain constant. They explain that the natural ebb and flow of the tide will compensate for any water withdrawn by the

Reservoir. The Tribe disagrees, in particular claiming that the Reservoir's withdrawals from the Mattaponi River will detrimentally alter the quality of the water available to the Tribe through its riparian rights in the River.

In sum, the effect of the common law riparian rights doctrine is that all riparian owners share the water and each is responsible to the others to use it reasonably. The concerns over maintaining the flow of the water and keeping it free of pollution are essential to the enjoyment of those rights.

> The general principle of law is that all riparian proprietors on the same stream have the same right to the use and enjoyment of its waters, but this use is qualified by the right of the others to have the same substantially preserved in its size, flow, and parity and to be protected against any material pollution of its waters. The use of one must not, therefore, be inconsistent with the rights of the others. The maxim *sic utere tuo ut alienum non laedas* (use your own property in such a manner as not to injure that of another) emphatically applies to the case of a riparian proprietor, and is the true legal as well as moral measure of his rights.

*See* 20 M.J., *Waters and Watercourses*, § 10. *See also Arminius Chemical Co. v. Landrum*, 113 Va. 7, 18-19, 73 S.E. 459, 464-65 (1912).

The passage of years following *Tyler v. Wilkinson* saw an evolution of the law regarding riparian rights. While the jurisdictions that adopted the common law riparian doctrine still adhered to it, the increasing demand for water and an increasing awareness of the necessity for insuring clean water resulted in jurisdictions supplementing common law riparianism with various types of regulation.

> Over time, as the shortcomings of pure riparian rights became more apparent, the eastern states began to overlay regulatory requirements on water withdrawals that slowly eroded pure riparianism. For instance, pure riparianism did not effectively protect instream uses, but almost all states now regulate water withdrawals in a way that ensures that a certain minimum instream flow remains in the waterbody. This doctrine, primarily known as "regulated riparianism," is now the prevalent model in the non prior appropriation rights states.

John M. Lain, *Water at the Crossroads: The Intersection of Water Supply and Water Quality Issues and the Resulting Effect on Development*, 4 (2004) (citing

Joseph W. Dellapenna, *Owning Water in the Eastern United States*, 6 Proc. 6 Mineral L. Found. (1985)).

Virginia itself has adopted some provisions of regulated riparianism to deal with the uncertainties associated with common law riparian rights. For example, Virginia strives to protect "beneficial instream uses" by requiring the creation and issuance of permits in certain circumstances, where those beneficial uses would potentially be without protection under common law riparianism. Va. Code § 62.1-44.15:5.

## II. *Prior Appropriation*

In contrast to riparian principles, the prior appropriation system of water rights is not founded on a concern for a proprietor's corresponding access to water adjacent to his land. It is instead based on a "first in time, first in right" principle that originated in the arid states of the west and "is the antithesis of common law riparianism." *See Arizona v. California*, 373 U.S. 546, 555, 83 S. Ct. 1468, 1475 (1963); Hope M. Babcock, *Reserved Indian Water Rights in Riparian Jurisdictions*, 91 Cornell L. Rev. 1203, 1213 (2006). The prior appropriation doctrine grants water use rights on a priority basis, and unlike riparianism, does not strive to ensure unprejudiced access to water.

The driving force behind prior appropriation is the limited supply of water that is a common attribute of the typically arid western states. *Irwin v. Phillips*, 5 Cal. 140 (1855), is generally mentioned as first introducing the principles of prior appropriation. *Irwin* effectively rejected riparian principles in favor of appropriating water for the needs of Californian miners, perceiving that the scarce supply of water in the California mining country necessitated that water be designated toward use for beneficial purposes. *See Irwin*, 5 Cal. at 146-47.

Eventually, the premise of *Irwin* extended across the West, prompting western states further to develop and adopt the prior appropriation doctrine, which in essence assures that one who first diverts water for a beneficial purpose will have a fixed quantity of water for such purpose so long at it remains beneficial. *Arizona Copper Co. v. Gillespie*, 12 Ariz. 190, 202-03, 100 P. 465, 469 (1909), affirmed 230 U.S. 46, 33 S.Ct. 1004 (1913)). Senior appropriators of water, or those first to use it productively, find their water needs met, and potential water users who come later in time may very well be without any water for their needs, particularly during periods of water shortage. *Arizona v. California*, 460 U.S. 605, 620, n. 11, 103 S. Ct. 1382, 1392 (1983) (citing with approval F. Trelease, *Cases and Materials on Water Law*, 11 (3d ed. 1979)).

The priority of use rule is one of striking contrast to the tenets of the riparian rights doctrine, which attaches water rights to ownership of riparian land and attempts to ensure that all riparian landowners are entitled to reasonable use of the water. *Arminius Chemical Co. v. Landrum*, 113 Va. 7, 16, 73 S.E. 459, 464 (1912). *See Colorado v. New Mexico*, 459 U.S. 176, 179, 103 S. Ct. 539, 543 (1982) (discussing the differences in how riparian and prior appropriation rights are vested). The prior appropriation doctrine, on the other hand, does not vest water rights based on ownership of land adjacent to a water source. Instead, prior appropriation vests the right to use water from a particular source in the first individual to divert that water for a beneficial purpose. *Id.*

Eastern states have yet to find reason to abandon riparian rights, in either its common law or regulated form, in favor of a genuine prior appropriation system. Certainly, eastern states enjoy a bountiful water supply, thus effectively precluding the need for a prior appropriation system. Moreover, it may be that common law riparian rights implicitly presuppose that ensuring reasonable use will supply adequate water to sustain beneficial activities. Regulated riparianism can be viewed as a compromise to ensure that beneficial activities are protected under riparian law as they are under prior appropriation. *See generally* Hope M. Babcock, *Reserved Indian Water Rights in Riparian Jurisdictions*, 91 Cornell L. Rev. 1203, 1217-20 (2006) (discussing regulated riparianism as a response to common law riparianism's modern shortcomings).

There is an obvious distinction between the aqueous characteristics of eastern and western states, which has resulted in a dichotomy with respect to their laws and regulations governing water rights. Such clear differences are critically important in discerning the applicability of the reserved water rights doctrine in riparian jurisdictions such as Virginia.

## III. *The Nature of Reserved Water Rights and the Winters Doctrine*

The reserved water rights doctrine advocated by the Tribe developed within the prior allocation arena. *Winters v. United States*, 207 U.S. 564, 28 S. Ct. 207 (1908), the seminal case concerning reserved water rights, presented the United States Supreme Court with a dispute over the water rights of a federal Indian reservation located in Montana, a prior appropriation state. In *Winters*, a group of irrigators claimed that, because they had used the water in question for a beneficial purpose and continued to do so before the Indian reservation sought to use the same water, they had acquired the right to use the water under the doctrine of prior appropriation.

The Supreme Court disagreed and opined that the creation of the Indian reservation necessarily implied that water was reserved for the Indian reservation's use, in an amount sufficient to achieve the primary purposes of the Indian reservation. *Winters*, 207 U.S. at 576, 28 S. Ct. at 211-12. The Court recognized that the lands encompassing the Indian reservation were "arid and, without irrigation, were practically valueless." *Id.* The Court further surmised that the federal government created Indian reservations with an intent to turn the Indians to a more organized and concentrated agrarian society, and perhaps also to allow the Indians to keep their aboriginal fishing and hunting practices. *Id.* The Court thus held that, in order for those purposes to be fulfilled, the Treaty creating the Indian reservation impliedly reserved a sufficient quantity of water to the reservation, even though the Treaty itself was silent with regard to water rights. *Winters*, 207 U.S. at 576-77, 28 S. Ct. at 211.

This principle of reserved water rights, also called the "*Winters* doctrine," is one of necessity. *Cappaert v. United States*, 426 U.S. 128, 139, 96 S. Ct. 2062, 2070 (1976). Under prior appropriation, it is obvious that a western Indian reservation like the one in *Winters* could have easily been left without sufficient water, especially during times of water shortage, if there were an appropriator senior in time to the creation of the Indian reservation. Without sufficient water, the government's purpose of transforming the tribe into an organized society by creating the Indian reservation would go unfulfilled. *Winters*, 207 U.S. at 576, 28 S. Ct. at 211. The tribe could further not expect to preserve their aboriginal practices without sufficient water. *See id.*; *see also Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) (finding a treaty implied reserved water for the protection of a tribe's aboriginal fishing practice). Thus, the *Winters* doctrine was developed, creating the implication that, with each purposeful federal action relating to an Indian tribe, at least in prior appropriation states, "water necessary to fulfill the purpose of the reservation, no more" is reserved to the tribe. *Cappaert*, 426 U.S. at 141, 96 S. Ct. at 2071.

In sum, the *Winters* doctrine has been applied to preempt state water law in order to fulfill the purposes of federal action relating to a federally recognized Indian tribe, most typically the creation of an Indian reservation. Yet the doctrine preempts state water law *only when necessary* and only by impliedly reserving that quantity of water necessary to fulfill those purposes. To this point, parties have asserted this necessity only in the context of prior appropriation, where the fear of senior appropriators precluding Indian reservations from having sufficient water arguably requires an implication of reserved water rights.

While the doctrine of reserved water rights clearly trumps the rules of prior appropriation when necessary to effectuate the purposes of a federal Indian reservation, the suitability of its application in riparian states is highly uncertain. In addition, the doctrine has been applied exclusively to federally recognized Indian tribes, creating the question as to whether it can be even considered at the state level. The Defendants have attacked the Tribe's assertion of reserved water rights on both the question of the doctrine's suitability in a riparian jurisdiction and its applicability outside the federal context.

IV. *The Applicability of Reserved Water Rights and the Winters Doctrine in the State Context*

The *Winters* doctrine has never been applied to an Indian tribe unrecognized by the federal government. The Mattaponi Tribe is not federally recognized, but it is recognized by the Commonwealth of Virginia. The Mattaponi Reservation, on which some members of the Tribe reside, was initially set aside, from land long held by the Tribe, by an act of the General Assembly of Virginia in 1658. The 1677 Treaty affirmed the existence of this Tribal land. The Defendants argue that because the Tribe is not federally recognized, it is prohibited from invoking the protection of reserved water rights.

Certainly, the doctrine of reserved water rights has enjoyed preemptive force through the federal Constitution. The Constitution gives Congress the plenary power to regulate all matters relating to federally recognized Indian tribes, including commerce with them. U.S. Const., art. I, § 8, cl. 3. As the Defendants point out, the federal supremacy clause serves to ensure that state water laws do not unduly interfere with federal functions stemming from its plenary power relating to Indian tribes. U.S. Const., art. VI, cl. 2. *See Sierra Club v. Yeutter*, 911 F.2d 1405, 1419 (10th Cir. 1990). It follows that the *Winters* doctrine and reserved water rights preempt state water law through the supremacy clause, insofar as it is necessary to ensure purposeful functions relating to the Indians are carried out. The Defendants are thus correct in asserting that reserved water rights, as applied to federal Indian reservations, are reserved independent of state water laws. *See Colville Confederated Tribes*, 647 F.2d at 53 (discussing *United States v. McIntire*, 101 F.2d 650, 654 (9th Cir. 1934)).

The Court nevertheless disagrees with the Defendants' broad assertion that the *Winters* doctrine and reserved water rights are unique and exclusive to the federal context. Such a sweeping declaration endorses an inaccurate and

narrow view of the reserved water rights doctrine. Perhaps, as the Defendants allude to in their brief, the sense in which "reserved water rights" is used in the Tribe's Amended Complaint has introduced confusion about the rights the Tribe seeks to assert. To be sure, as the Tribe lacks federal recognition, it clearly cannot rely on the preemptive force of the federal Constitution's supremacy clause to supersede Virginia's riparian law through the *Winters* doctrine. In that sense, the Defendants are correct in asserting that reserved water rights are federal rights.

Nonetheless, the fact that the reasoning forming the basis of the *Winters* doctrine has, to the present day, been applied only through federal law does not preclude the same reasoning from potentially having force on the state level. As recognized by all parties to this action, the critical element of the *Winters* analysis is necessity. Water is impliedly reserved to an Indian tribe, and to the sovereign as guardian of the tribe, when necessary to effectuate a purposeful act relating to Indians, as well as to help protect the tribe's aboriginal practices. *Winters*, 207 U.S. at 576-77, 28 S. Ct. at 211-12; *Colville Confederated Tribes*, 647 F.2d at 48. It is therefore essential to examine the logic behind this element of necessity, as it is crucial in understanding *Winters*' possible application in the state context.

An important aspect of the *Winters* court's reasoning hinged on the fact that the United States itself brought the suit as the guardians of the Indians, as permitted by the federal Constitution, claiming the United States reserved water on behalf of the Indians when executing the treaty at issue. The *Winters* court recognized that the purposes for which the United States created Indian reservations, as guardians of the Indians, implied that the United States reserved sufficient water to achieve those purposes. "It would be extreme to believe that ... Congress ... took from the Indians the consideration of their grant, leaving them a barren waste – took from them the means of continuing their old habits, yet did not leave them the power to change to new ones." *Winters*, 207 U.S. at 577, 28 S. Ct. at 212.

The Court also probed the logic of implying reserved water by examining whether the tribe itself reserved sufficient water through negotiating for the Indian reservation. In resolving the treaty in favor of the Indians and thus implying that water was reserved through the treaty, the Court stated:

> We realize that there is a conflict of implications, but that which makes for the retention of the waters is of greater force than that which makes for their cession. The Indians had command of the lands and the waters – command of all their beneficial use,

whether kept for hunting, "and grazing roving herds of stock," or turned to agriculture and the arts of civilization. Did they give up all this?

*Winters*, 207 U.S. at 576, 28 S. Ct. at 211. Thus the Court adopted the notion that the Indians would not have bargained for the reservation of land, as well as the resulting cessation of land to the government, without believing that they would have sufficient water to sustain their existence. *Id.*

Essentially, *Winters* and its progeny stand for the idea that it would be irrational to believe a government would establish an Indian reservation for a tribe if the Indian reservation would not enjoy the amount of water needed to further the purposes behind its creation and sustain its inhabitants. Likewise, *Winters* and its successors reason that a tribe would not bargain for a reservation of land without believing it would have sufficient water to sustain itself. As a result, the courts have implied a logical consequence, federal actions relating to Indian tribes, when necessary, tacitly reserve a quantity of water sufficient to ensure that the purposes behind those actions are fulfilled. *See Arizona v. California*, 373 U.S. 546, 600-01, 83 S. Ct. 1468, 1498 (1963); *Cappaert*, 426 U.S. at 139, 96 S. Ct. at 2069; *Colville Confederated Tribes*, 647 F.2d at 46.

This idea of implying a reservation of water necessary both to effectuating the purposes of a treaty or other government act and sustaining the vitality of an Indian tribe is unquestionably an idea that is neither exclusive nor unique to the federal context. If it be assumed that a state government set aside land for an Indian reservation for the purpose of transforming tribal society, as well as helping the tribe protect its aboriginal customs, then it follows that the state would almost certainly intend that enough water is available to achieve those purposes. This especially holds true in jurisdictions like Virginia, where the Commonwealth has assigned trustees to serve as guardians of the Mattaponi, just as the federal government acts as guardians of its Indian tribes. 1896 Va. Acts, ch. 843. *See* 1 Va. Ops. Att'y Gen. 107, 108-09 (1977); Ops. Va. Att'y Gen. 160 (1917-18) ("Mattaponi Indians of Virginia, are wards of the State, just as the Indians under the guardianship of the United States are wards of the nation.").

Indeed, the reasoning of the *Winters* court makes it difficult to believe that an Indian tribe would negotiate for or acquiesce in the creation of an Indian reservation if that reservation could not sustain the tribe. As mentioned, *Winters* contains strong language indicating that the tribe itself reserved water through the treaty and creation of the Indian reservation, apart from any reserved water imputed to the tribe through its relationship with the United States. *Winters*, 207 U.S. at 576-77, 28 S. Ct. at 211. *See also Arizona v. San*

*Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 103 S. Ct. 3201 (1983) (demonstrating a case where a tribe asserted reserved water rights on its own standing); *Colville Confederated Tribes*, 647 F.2d at 48. Although this notion has been applied exclusively to federally recognized Indian tribes, there is no reason why state recognized Indian tribes would not have similarly bargained to reserve water for their own sustenance.

Therefore, the reasoning behind the *Winters* doctrine is as equally applicable to state Indian tribes as it is to federally recognized tribes. It may be true that the *expression* "reserved water rights" and its application to this point, when narrowly read, may import a singular meaning that is unsuitable for consideration in the state context. Yet the fact that the *Winters* doctrine has not yet been applied to state Indian tribes does not preclude it from being appropriate in the state context. Indeed, it is certainly possible that the doctrine has been applied exclusively in the federal context only because of the rarity of state-maintained Indian reservations for tribes that are not federally recognized.

The idea that a state government may impliedly reserve sufficient water to achieve its goals for its resident Indian tribes is undeniably compatible with the *Winters* doctrine. This is especially true if the state is in a guardian-ward relationship with the Indian tribe. It follows that the trustees of the Mattaponi could bring suit as guardians of the Mattaponi Tribe to assert that the Commonwealth impliedly reserved sufficient water to carry out the Commonwealth's purposes when creating the Mattaponi Reservation and negotiating the 1677 Treaty.

Likewise, a state Indian tribe may have impliedly negotiated to set aside water to sustain its reservation, and possibly protect its aboriginal practices, just as federally recognized tribes have done through the *Winters* doctrine. *See, e.g., Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 103 S. Ct. 3201 (considering a water rights proceeding brought by an Indian tribe). It is in this manner that the Mattaponi Tribe itself can attempt to assert reserved water rights pursuant to both the negotiated rights of the 1677 Treaty at Middle Plantation and its aboriginal rights. Indeed, the Tribe "possesses in its own right justiciable interests," *Mattaponi Indian Tribe v. Commonwealth*, 261 Va. 366, 378, 541 S.E.2d 920, 926 (2001), and it need not rely on the trustees of the Tribe, acting in their capacity of guardians of the Tribe, to assert an implication of reserved water.

In sum, an Indian tribe's ability to invoke the *Winters* doctrine is not dependant upon a status of having federally recognition. The reasoning of *Winters* logically extends to state-recognized tribes and the governments that act as their guardians.

## V. *Reserved Water Rights and the Winters Doctrine in Riparian Jurisdictions*

Although a state recognized Indian tribe is not precluded from attempting to assert reserved water rights solely on the basis of its non-federal status, it does not follow that any state tribe may axiomatically seek relief under the *Winters* doctrine without making a showing of necessity for reserved water rights. To be sure, as both parties acknowledge, the necessity for reserved water is the crucial element behind the doctrine.

Accordingly, it is this element of necessity that creates a high degree of skepticism regarding the applicability of reserved water rights in riparian rights states. The *Winters* doctrine created reserved water rights in the prior appropriation context to circumvent the very real possibility that Indian tribes would lose water to senior appropriators, especially in times of shortage. *See, e.g., United States v. Anderson*, 591 F. Supp. 1, 5 (D. Wash. 1982) (discussing how the *Winters* doctrine is antithetical to prior appropriation). Thus, it was *necessary* to preempt state prior appropriation law and reserve the quantity of water needed to ensure that the tribes could sustain themselves and their reservations. *Id.*

The riparian rights doctrine, in contrast to the prior appropriation system, guarantees a riparian owner "a reasonable use of the water flowing by his premises in a natural stream as an incident to his ownership of the soil. . . ." *Arminius Chemical Co. v. Landrum*, 113 Va. 7, 16, 73 S.E. 459, 464 (1912). Yet riparianism vests priority of use in no one, "as all other owners upon the same stream have the same right, the right of no one is absolute. . . . The lower riparian owners are entitled to a fair participation in the use of the water, and their rights cannot be cut down by necessity or convenience of the defendant's business." *Id.* Even in times of shortage, riparian owners must reduce their use of water to maintain reasonable use. Thus, while riparian law may create uncertainty over the quantity of water to which one may be entitled, it strives to ensure that each riparian owner enjoys reasonable use of the water running through or adjacent to his land, and protects against injury from another's unreasonable use of the water.

As the Defendants point out, the abundance of water found in eastern states effectively creates a presumption that sufficient water will be available for all users, thus alleviating any serious concerns over the amount of water available to a riparian proprietor. This claim, although almost certainly based solely on the common law riparian doctrine, illustrates why the *Winters* doctrine may have little applicability in riparian states. If riparian law ensures that each user will have a reasonable share of water, in a jurisdiction where water shortages seldom occur, then the fear of leaving an Indian reservation without sufficient water for sustenance and fulfilling its purposes dissipates.

The same would hold true for any other government act relating to Indians, such as negotiating a treaty for the protection of Indian fishing rights.

The element of necessity essential to invoke the *Winters* doctrine is unsatisfied in these situations, as riparian law would likely provide the amount of water needed to fulfill the purposes underlying government acts relating to Indians. Likewise, a tribe's ability to sustain itself and protect its aboriginal practices would be adequately served by riparian law. Consequently, *Winters* would be rendered inapplicable in these instances.

For those reasons, the Court shares the skepticism associated with applying reserved water rights in a riparian jurisdiction such as the Commonwealth. Nonetheless, the Court is not convinced that the *Winters* doctrine can never be legitimately applied in a riparian jurisdiction. Because reserved water rights hinge on the question of necessity, it is plausible that even in a riparian jurisdiction it may be necessary to imply reserved water pursuant to an Indian reservation or treaty-granted right. Common law riparianism only grants a riparian owner "a reasonable use of the water … without sensible alteration in quality or unreasonable diminution in quantity." *Arminius Chemical Co. v. Landrum*, 113 Va. at 16, 73 S.E. at 464. Reasonable use, however, does not necessarily comport with a riparian owner having a sufficient quantity or quality of water to achieve a certain purpose. Common law riparianism primarily strives to ensure that all riparian owners along a water source have equal access to the water, but does not necessarily seek to protect an individual's subjective preferences for either the amount or type of water he may require for a certain use. *See Colorado v. New Mexico*, 459 U.S. 176, 179, 103 S. Ct. 539, 543 (1982) (discussing the differences between riparian and prior appropriation law).

It may be true that the abundance of water in eastern states creates a high probability that all riparian owners will have sufficient water for gainful purposes, even though riparian owners are limited to reasonable use of the water flowing through or adjacent to their land. Nevertheless, the Court cannot ignore the premise that riparian law does not guarantee a riparian owner sufficient water for a particular purpose. One can imagine a situation of a riparian landowner wishing to use his land for a particular beneficial purpose, but finding the quantity of water sufficient for that purpose to be unreasonable under riparian law.

Alternatively, one can arguably envision a situation where an upstream riparian owner makes a new, but reasonable use of the water flowing through his land, yet such use is still detrimental to a downstream riparian owner's uses. Consider a downstream riparian accustomed to having a sufficient quantity and quality of water for a gainful activity. The downstream riparian owner could very well discover an upstream riparian owner who has begun

using water in a new manner that is reasonable under riparian law, yet creates a deficiency in the quantity or quality of water available to the downstream riparian owner. Because reasonableness does not necessarily guarantee that a riparian owner will have sufficient water for that individual's activities, that downstream owner may not be able to sustain the gainful activity he enjoyed before the upstream owner's new use.

Analogizing to the present case, the Mattaponi Reservation, being appurtenant to the Mattaponi River, is guaranteed only the reasonable use of the river's water under riparian law. Riparian law, however, does not guarantee the Tribe the required quantity or quality of water needed to satisfy the purposes for which the Reservation was created. The same holds true for any rights the Tribe may possess under the 1677 Treaty, including protection of its aboriginal practices.

The *Winters* doctrine effectively stands for the proposition that a government, as well as an Indian tribe, can impliedly reserve water for that tribe's sustenance and thereby override customary state water law when *necessary* in light of inadequate protection offered by state water law. An Indian tribe, or the government as its guardian, could invoke the *Winters* doctrine by showing that riparian law would not provide the tribe with the quantity or quality of water sufficient to sustain its Indian reservation, protect other rights granted through government action, or preserve its aboriginal practices. Such a showing would satisfy the *Winters* doctrine's critical element of necessity and therefore permit an assertion of reserved water rights. The inadequacy of riparian law could necessitate an implication that both a quantity and quality of water needed to achieve the purposes underlying an Indian reservation were reserved at the time of the Indian reservation's creation. The same would hold true for ensuring that sufficient water is available to protect any other treaty-granted rights enjoyed by an Indian tribe. Thus, as a matter of law, only through this showing of necessity could a tribe, or a government as the tribe's guardian, preempt a state's riparian law in favor of reserved water rights.

## VI. *Reserved Water Rights Cannot Serve as a Basis for Relief Based on the Facts Before the Court*

Based on the pleadings and other documents presented, the Tribe has not sufficiently pleaded the element of necessity and thus cannot assert reserved water rights as a basis for relief. The Tribe's pleadings merely claim that it reserved a sufficient quantity and quality of water at the execution of the Treaty, as well as from "time immemorial" by way of its aboriginal practices. The Tribe's assertion presupposes that the critical element of necessity,

essential in invoking the *Winters* doctrine, is axiomatically met by simply claiming reserved water rights.

To subscribe to such an assumption would ignore the essence of the *Winters* doctrine and preempt Virginia's customary adherence to riparian law without demonstrating that it would be necessary to imply reserved water rights. Common law riparianism guarantees the Tribe reasonable use of the water in the Mattaponi River, and the Tribe has indeed sought relief under riparian rights, claiming that the Reservoir project would violate its right to reasonable use of the water as a riparian owner of the Reservation land. To be sure, the Tribe is not precluded from pleading an alternative basis for relief through claiming reserved water rights.

Yet as a matter of law, the element of necessity must be satisfied to invoke the *Winters* doctrine and sustain a claim of reserved water rights in the context of Virginia's conventional riparian law. Thus, to survive a demurrer, the Tribe's pleadings must demonstrate that Virginia's riparian rights system would not adequately protect its rights claimed under the Treaty and through its aboriginal practices. This would demonstrate that an implication of reserved water rights is necessary to adjust for riparianism's inadequacy.

The Tribe makes no assertion of the required element of necessity. The Tribe argues only that sufficient water was reserved both through the Treaty and its aboriginal practices and, thus, it is entitled to relief through reserved water rights. The Tribe, however, overlooks the fundamental purpose of the *Winters* doctrine, which implies reserved water rights in order to supersede conventional state water law, but only when necessary to sustain a tribe's existence or to effectuate the purposes of a government act relating to an Indian tribe. The Tribe makes no assertions that would tend to establish a necessity for implying reserved water rights. The Court is surely not going to depart from time-honored riparian law where there is no demonstration of a necessity for reserved water rights.

Because the Tribe has not asserted the element of necessity required to invoke the *Winters* doctrine, the Tribe's claim of reserved water rights is insufficient as a matter of law. For this reason, the Defendants' demurrer as to reserved water rights will be sustained, and the Tribe is granted leave to amend its pleadings.

The Court is of the opinion that because it sustained the demurrer with a grant of leave to amend, summary judgment is improper and untimely, and, therefore, the Defendants' motion for summary judgment should be dismissed.